# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                         )
**JASON BALZARINI,**             )
                         )
     **Plaintiff,**           )
                         )     **Civil Action No.**
     **v.**                     )     **17-11313-FDS**
                         )
**TOWN OF ROCKPORT, JOHN**    )
**HORVATH, and MARK SCHMINK,** )
                         )
     **Defendants.**          )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO AMEND

**SAYLOR, J.**

This is a case of alleged employment discrimination based on military service. Plaintiff Jason Balzarini is a patrol officer for the Rockport Police Department and a staff sergeant in the Massachusetts Army National Guard. Defendant John Horvath is the Rockport Police Chief. Defendant Mark Schmink is a Lieutenant in the Rockport Police Department.

Balzarini joined the National Guard in 2002 and was deployed on active duty in Afghanistan from 2012 to 2013. He was hired by the Rockport Police Department in 2008 in a part-time position, and was promoted in December 2013 to full-time status after filing a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging discrimination based on military service. For the next several years, he received multiple departmental honors and accolades.

In July 2017, Balzarini was reprimanded and effectively demoted for what he acknowledged was a failure of "communication." In September 2017, he was disciplined again

for the unauthorized firing of a civilian's weapon. He alleges that both instances of discipline, along with other examples of workplace hostility, constitute unlawful discrimination based on his National Guard service in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.*

Defendants have moved for summary judgment, and plaintiff has moved to amend the complaint to add a claim under state law. For the reasons stated below, the motion for summary judgment will be granted in part and denied in part, and the motion to amend will be denied.

## I.  **Background**

### A.  **Factual Background**

The following facts are as set forth in the record and are undisputed except as noted.[1]

Jason Balzarini is a patrol officer with the Town of Rockport Police Department. (FAC ¶ 2).

John Horvath is the current Police Chief of the Rockport Police Department. (Horvath Dep. at 24). Mark Schmink is a Lieutenant with the Rockport Police Department. (FAC ¶ 3). Lt. Schmink previously served for four years in the Marine Corps and attained the rank of lance corporal. (Schmink Dep. at 13).

In 2002, before joining the Rockport Police, Balzarini enlisted in the Army National Guard. (FAC ¶ 6). He was promoted to sergeant in 2008. (*Id.*).

In December 2008, Balzarini was hired by the Rockport Police Department. (Balzarini Dep. at 11). He was hired as a Permanent Intermittent Police Officer, which is a part-time position. (*Id.*). He was hired by then-Rockport Police Chief Tom McCarthy. (*Id.* at 16).

In 2009, Balzarini was promoted to staff sergeant in the National Guard. (FAC ¶ 6).

---

[1] Many of the exhibits were provided by both parties. For convenience, the Court will refer to defendants' exhibit numbers whenever possible.

In 2010, Lt. Schmink recommended Balzarini for assignment to the Cape Ann Regional Response Team ("CARRT"), a post Balzarini viewed as desirable. He did so in part because he felt Balzarini's National Guard experience would be advantageous. (Schmink Dep. at 119-20).

On August 3, 2012, Lt. Schmink issued a warning to Balzarini for only working 11 out of a required 24 shifts. (*Id.* at 43). When Balzarini informed Lt. Schmink that he had upcoming National Guard training, on at least one occasion Schmink responded to the effect of "How long is this going to keep going as far as the National Guard?" (Balzarini Dep. at 34). Previously, Lt. Schmink had also allegedly discouraged another officer from joining the Coast Guard Reserves, stating that it would interfere with his obligations as a police officer. (Andrus Aff. ¶¶ 8-9).

As part of his National Guard duties, Balzarini was deployed to Afghanistan from 2012 to 2013. (FAC ¶ 6). While on active duty, in February 2013, he was bypassed for a promotion in Rockport to a full-time police officer. (*Id.* ¶ 8). Balzarini appealed that decision to the Massachusetts Civil Service Commission and filed a complaint with MCAD alleging discrimination based on his military service. (*Id.* ¶ 10). Lt. Schmink was named as a respondent. (Schmink Dep. at 45). A settlement was reached that resolved both the Civil Service appeal and the MCAD complaint. (FAC ¶ 12; Balzarini Dep. at 42-43; Def. Ex. 15 at 7). Under the terms of the settlement agreement, Balzarini was appointed a permanent full-time police officer in December 2013. (*Id.*).

Chief McCarthy retired on October 31, 2014. (Vieira Aff. ¶ 3). James Mulligan was then appointed interim police chief on December 1, 2014. (*Id.* ¶ 4).

On January 6, 2015, Acting Chief Mulligan changed how compensation was provided to officers who were attending National Guard training. Previously, under Chief McCarthy, an officer attending Guard training was paid both the full amount he would have earned while

working for the Rockport Police and the amount paid by the Guard. (Def. Ex. 4 at 54-55; Def. Ex. 6). Acting Chief Mulligan believed that because the officers were not serving the town during military training, they were in effect "double dipping" salaries. (Def. Ex. 6). He stated that the practice was straining the Rockport Police Department's budget. (*Id.*). Acting Chief Mulligan ordered that for all future training sessions, the town would only pay the difference between the amount paid by the Guard and the amount the officers would have been paid had they worked for Rockport, assuming that the Guard salary was lower. (*Id.*).

In response, the Rockport Patrol Officers' Union filed a grievance on behalf of Balzarini and two other officers who were National Guard members. (Def. Ex. 7). According to Balzarini, Lt. Schmink stopped being supportive of his Guard service immediately after the grievance was filed. (Balzarini Dep. at 52).

On July 7, 2015, Balzarini was assigned as a full-time member of the Police Department's Honor Guard. (Def. Ex. 8). On Lt. Schmink's recommendation, he was appointed as supervisor of the Honor Guard. (Balzarini Dep. at 170).

Horvath was appointed Rockport Police Chief on May 18, 2015. (Horvath Dep. at 26). Chief Horvath was informed by Lt. Schmink that the change that Mulligan made as to how National Guardsmen attending trainings were compensated was still in effect. (*Id.* at 48-49). Lt. Schmink also provided Chief Horvath with information concerning the number of days each officer took for military leave, so that he could include the figures in his proposed budget to the Town's Finance Committee and Board of Selectmen and better advocate for more funding. (*Id.* at 50-53). According to defendants, that information was also necessary to help determine how best to fill the shifts left open by these officers, and others who were injured on duty or on other types of leave. (*Id.* at 62-69).

In order to calculate pay accurately for police officers serving in the National Guard, the Police Department required documentation of the officers' Guard pay. (*Id.* at 77). In addition, to ensure that there would be sufficient coverage during Guard training, Lt. Schmink requested that Balzarini and two other officers who were Guardsmen provide their training schedules. (Schmink Dep. at 94-101).

On February 2, 2016, Chief Horvath announced a change to the department's "time off procedure." (Def. Ex. 9). The change would permit Balzarini to take one additional day off each month for his National Guard obligations between February and June. (*Id.*). However, to help him schedule shifts for officers, Chief Horvath requested that Balzarini provide Lt. Schmink the days he intended to take off for National Guard training. (*Id.*).

On February 22, 2016, Lt. Schmink requested that Balzarini and the two other officers in the National Guard provide their training schedule for 2016, along with paystubs and the names and contact information for the commanding officers of their assigned units. (Def. Ex. 10). Lt. Schmink requested that the documents be provided by March 1, 2016. (*Id.*). However, by March 1, all three officers had failed to fully comply with the request. (Def. Ex. 11). Balzarini objected to the request, stating that it was unreasonable for the Police Department to want proof that he attended the training. (Balzarini Dep. at 73-76).

On March 4, 2016, Chief Horvath ordered that Balzarini schedule a meeting with him to discuss his non-compliance with Lt. Schmink's request. (Def. Ex. 4 at 62-63; Def. Ex. 12). Chief Horvath also reiterated Lt. Schmink's order that Balzarini provide a copy of his 2016 training schedule, a copy of his most recent National Guard paystub, and the name and contact information of his commanding officer. (*Id.*). On March 6, 2016, Lt. Schmink called Balzarini's National Guard Commanding Officer, First Sergeant Thomas Bonner. (Schmink Dep. at 102-

03).

On March 7, 2016, Chief Horvath and Lt. Schmink met with Balzarini and an officer named Adam Ludovicz (who was another National Guardsman). (Balzarini Dep. at 63-63). Chief Horvath expressed frustration that he had to address this matter, making statements to the effect of "Where do you think I have time to be doing this?" and "I have other stuff to be doing." (*Id.* at 62).

After the meeting, Balzarini provided his most recent National Guard paystub, which showed that his hourly Guard pay was higher than his police pay. (Def. Ex. 13). Therefore, under the terms of the pay policy put into effect by Mulligan, Rockport no longer needed to pay Balzarini for his Guard training. Balzarini then stopped providing the Police Department with his paystubs because he "was not receiving offset pay" anymore. (Balzarini Dep. at 85). Around that time, Chief Horvath objected to Balzarini's practice of redacting the locations of his training. (*Id.* at 129-31).

On May 29, 2016, Lt. Schmink sent an e-mail to Balzarini praising his work in preparing an operation plan for Memorial Day. (Def. Ex. 14).

Sometime in July 2016, Balzarini hurt his back "a little bit" while helping to bring an obese man to an ambulance. (FAC ¶ 18; Balzarini Dep. at 112). He "reported the incident casually." (Balzarini Dep. at 112). The following day, Lt. Schmink and Chief Horvath asked whether he had suffered an injury while on active duty in Afghanistan. (*Id.* at 113). Chief Horvath stated, "If you can't work here, that's fine, just let us know and we'll take care of it." (*Id.*). Balzarini responded that he had suffered no injuries that would prevent him from serving as an officer. (*Id.*).

Also sometime during 2016, Chief Horvath assigned Sergeant Timothy Frithsen to

investigate a civilian complaint against Balzarini concerning a motor-vehicle accident. (Frithsen Aff. ¶ 3). The complaint was filed by a woman named Judith Szuets. (*Id.*). Frithsen attempted to locate the other driver involved in the accident, but was unable to. (*Id.* ¶ 5). The case was closed out by Chief Horvath. (*Id.* ¶ 10). Afterward, Chief Horvath reopened the case and again attempted to locate the other driver. (Horvath Dep. at 218-19). However, he was also unable to locate the driver, and closed the investigation a second time. (*Id.*). Frithsen thought it was unusual for a police chief to reopen an investigation after it was closed. (Frithsen Aff. ¶ 12).

On August 3, 2016, the arbitrator hearing the Rockport Patrol Officers' Union's challenge to the pay-policy change implemented by Mulligan ruled against the town. (Def. Ex. 15). The arbitrator based his decision solely on the ground that the town had not bargained for the change in practice. (*Id.*). Rockport then appealed the arbitrator's decision to the Superior Court.

Over the next year, Balzarini's superiors awarded him various commendations. (Def. Ex. 16). On November 2, 2016, Lt. Schmink assigned Balzarini to serve as the CARRT training instructor. (Def. Ex. 17). On April 11, 2017, Chief Horvath appointed Balzarini the officer-in-charge of the 4:00 p.m.-to-midnight shift. (Def. Ex. 18).

On April 27, 2017, Balzarini and Lt. Schmink were in New York City together attending police training. They learned that a Gloucester police officer had passed away, and texted each other about arrangements for the wake and funeral. (Def. Ex. 19). On April 30, 2017, Lt. Schmink e-mailed Balzarini, stating "[l]et's touch base and meet on Monday at some point to tighten up the Honor Guard arrangements for both the wake and funeral." (Def. Ex. 20). Lt. Schmink e-mailed him again on May 2, 2017, regarding the arrangements for the wake and funeral. (Def. Ex. 21). Balzarini replied the following day; however, he did not provide plans

for the funeral Honor Guard.  (Def. Ex. 22).[2]

On May 3, 2017, Balzarini informed Lt. Schmink that he was leaving work early because he was having trouble seeing.  (Def. SMF ¶ 43).  Lt. Schmink asked that he call him that evening to determine whether he could still cover the funeral, and if any shifts would be impacted.  (Def. Ex. 23.).  Balzarini did not call Lt. Schmink, either that evening or the following day.

On May 5, 2017, Lt. Schmink ordered Balzarini to explain why he had not provided his plans for the funeral Honor Guard and why he did not provide an update on his medical condition after leaving work early.  (Def. Ex. 24).  Specifically, Lt. Schmink wrote:

> It is your responsibility as the Officer in Charge to provide leadership by example, to set the standard and hold others accountable for their actions in similar circumstances.  You have failed to comply with my directives and expectations in regard to both your Honor Guard and the Officer in Charge responsibilities.  This has happened on numerous occasions over the past year which I have addressed with you informally via text, phone messages, e-mails and in person meetings.
>
> As a result of this latest issue, it has created more work for me for research, documentation and meetings to address and resolve these issues in order to ensure no future incidents occur and proper departmental supervision, compliance with policy and procedures and overall operations are maintained.  I would submit to you that it is your duty and responsibility to make less work for me and not more, less stress for me and not more.  It is your responsibility to seek me out and update me without being constantly prompted and contacted in various forms to force compliance of expectations or get answers and information.
>
> I have supported you in your efforts in regard to the Regional Response Team, Police Department and specialty training assignments.  It is disrespectful to me personally and embarrassing that I have spoken on your behalf and have to address this formally in this venue.

(*Id.*).

Balzarini replied on May 9, 2017.  In his response, he conceded that "communication [was] a key area of improvement."  (Def. Ex. 25).  Balzarini also stated

---

[2] Balzarini contends that he had scheduled days off from work on May 1 and 2, 2017.  (Balzarini Dep. at 152).

that he had been at training on May 5 through 7 and that he had been to see a doctor on May 5.  (*Id.*).

In late May 2017, Chief Horvath made a call to Sgt. Bonner, Balzarini's commanding officer in the National Guard.  (FAC ¶¶ 20, 22).  Chief Horvath asked whether in fact Balzarini had attended his training that month.  (*Id.*).  Sgt. Bonner called back on June 2, 2017, with Balzarini listening in.  (Balzarini Dep. at 82-87).  During that call, Chief Horvath requested verification that Balzarini was actually attending his training sessions and said something to the effect of "I don't like your tone."  (Bonner Aff. ¶¶ 8-10, 12).  Sgt. Bonner testified that this request was "highly unusual."  (*Id.* ¶ 19).

On June 21, 2017, Balzarini was presented with a "Notification of Charges" concerning his conduct between April 27 and May 9, 2017.  (Def. Ex. 26).  On July 1, 2017, Lt. Schmink recommended to Chief Horvath that Balzarini be removed from CARRT.  (Def. Ex. 27).  Chief Horvath agreed, and on July 5, 2017, issued a Corrective Action that included a written reprimand.  (Def. Ex. 28).  The Corrective Action also removed Balzarini from CARRT, stripped him of his Officer-in-Charge status, and demoted him from lead officer for the Honor Guard.  (*Id.*).

On August 28, 2017, while in the dispatch room, Lt. Schmink overheard a conversation between Balzarini and Officer Daniel Mahoney.  Balzarini told Mahoney that while responding to a complaint of gunfire last year, he had encountered an individual shooting at a wood pile.  (Def. Ex. 29).  The individual challenged Balzarini's shooting ability, and in response Balzarini used the individual's firearm (which he called a "shit gun[ ]") to shoot a target.  (*Id.*).  Mahoney confirmed the content of Balzarini's statements.  (*Id.*).

Prior to that date, Charlie Strople, a friend of the Rockport Police Department, had been permitted to use the department's firing range. (Schmink Dep. at 208-10). Strople had helped build the firing range and was licensed to carry firearms. (*Id.*). Other officers also used Strople's firearms at the firing range while wearing safety gear and in the presence of training instructors. (*Id.*). Those officers were not disciplined for firing Strople's firearms. (*Id.*).

On September 3, 2017, Lt. Schmink provided Chief Horvath additional information concerning the shooting incident. (Def. Ex. 30). On September 6, 2017, Horvath provided that information to the Rockport Assistant Town Administrator and Rockport Town Counsel for review. (Def. Ex. 31). However, because this lawsuit had already been filed, out of an abundance of caution, Chief Horvath asked that an outside investigator be retained to conduct the investigation. (*Id.*). A retired police chief was retained as the investigator.

On September 7, 2017, Chief Horvath placed Balzarini on Administrative Desk Duty pending the outcome of the independent investigation. (Def. Ex. 32). Another officer, Michael Anderson, who had accompanied Balzarini during the shooting, was also investigated. (Def. Ex. 33).

In response, the Patrol Officers' Union filed a grievance contesting Chief Horvath's decision to place Balzarini on Administrative Desk Duty. (Def. Ex. 34). Later, on October 11, 2017, Chief Horvath explained the rationale for his decision, and the grievance was denied. (*Id.*).

On September 29, 2017, the independent investigator issued his report, concluding that Balzarini had violated departmental policy by shooting an unauthorized

weapon on duty and for failing to request identification from the shooter he encountered. (Def. Ex. 35). Chief Horvath recommended that Balzarini be suspended for ten days without pay. (Def. Ex. 36). Anderson, who had not fired a weapon while accompanying Balzarini, received only a written reprimand. (Def. SMF ¶ 62). Chief Horvath ordered that Balzarini and Anderson both be retrained. (Horvath Dep. at 210-11; Def. Ex. 37).

On November 16, 2017, the Rockport Board of Selectmen held a disciplinary hearing concerning the shooting episode. (Vieira Dep. at 88-98). The Board of Selectmen agreed with Chief Horvath's recommendation and voted to suspend Balzarini for ten days without pay. (*Id.*).

On November 17, 2017, the Superior Court upheld the arbitrator's decision concerning the change in pay policy for National Guardsmen. Rockport then paid Balzarini all the back pay owed to him as a result of that decision. (Def. Ex. 39).

## B. Procedural Background

Balzarini filed this suit on July 17, 2017. An amended complaint was filed on September 29, 2017.[3] Count One asserts a claim under USERRA. Count Two seeks injunctive relief in the form of an order directing his supervisors to "refrain from contacting his National Guard training office except for legitimate business reasons" and "refrain from further harassment." After discovery, defendants moved for summary judgment. Balzarini has also moved to amend his complaint to assert a claim under the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws ch. 151B.

---

[3] Balzarini has sued the Town and two of his supervisors, Chief Horvath and Lt. Schmink. The USERRA applies to certain discriminatory acts by "employers." Under the statute, the term "employer" includes not only the actual employer (here, the Town of Rockport), but also any "person . . . to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. § 4303(4)(A)(i); *see Brandsasse v. City of Suffolk, Virginia*, 72 F. Supp. 2d 608, 617-18 (E.D. Va. 1999); *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp. 2d 423, 438 (E.D. Pa. 1998).

## II. **Motion for Summary Judgment**

### A. **Standard of Review**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### B. **Analysis**

The USERRA provides as follows:

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

(b) An employer may not discriminate in employment against or take any adverse

employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

38 U.S.C. § 4311. In analyzing a claim of discrimination under the USERRA, a court must conduct a two-pronged burden-shifting analysis. First, the employee's military service must have been at least a "motivating factor" in the adverse-employment action. *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 17 (1st Cir. 2007). A plaintiff "needs only to show that his military service was one of the factors that a truthful employer would list if asked for the reasons for its decision." *Kane v. Town of Sandwich*, 123 F. Supp. 3d 147, 154 (D. Mass. 2015) (citation and internal quotation marks omitted). Second, the "employer must show, by a preponderance of the evidence, that the stated reason was *not* a pretext; that is, that 'the action *would* have been taken in the absence of [the employee's military] service." *Velazquez-Garcia*, 473 F.3d at 17 (emphases and alteration in original) (quoting 38 U.S.C. § 4311(c)).[4]

The complaint alleges that defendants improperly disciplined Balzarini on two occasions: (1) on July 5, 2017, when Chief Horvath issued a written reprimand and removed Balzarini as a member of CARRT, as the supervisor of the department's Honor Guard, and as officer-in-charge of his shift; and (2) on September 7, 2017, when Horvath placed Balzarini on administrative desk duty after discovering he had discharged a firearm in violation of department regulations. The complaint further alleges that

---

[4] The test is different from the three-pronged burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which governs Title VII employment discrimination disputes.

defendants harassed Balzarini on multiple occasions from 2015 onward, creating a hostile work environment. The Court will address each contention in turn.

### 1. Disciplinary Actions in July 2017

As noted, Balzarini received a written reprimand, and other adverse employment consequences, in July 2017. He failed to develop an Honor Guard operations plan for a funeral, and did not notify Lt. Schmink about his health status as requested after leaving work early on May 3, 2017. Balzarini essentially admitted to the problems in a letter to Lt. Schmink on May 9, 2017, and acknowledged that he needed to improve his "communication." (Def. Ex. 25).

The question is whether a reasonable jury could conclude that defendants' decision to discipline Balzarini at that point was motivated, even in part, by his National Guard service. The evidence as to that issue, while hardly overwhelming, is sufficient to deny summary judgment.

As to Lt. Schmink, who recommended the July 2017 disciplinary consequences, the evidence is thin. Among other things, Lt. Schmink requested information from Balzarini concerning his National Guard service in February 2016, and spoke to his commanding officer in March 2016. He also participated in meetings with Chief Horvath at which Balzarini's National Guard service was discussed, allegedly in a negative light.

Some of Balzarini's contentions border on the trivial; for example, he contends that Lt. Schmink's decision to use e-mail instead of text to communicate with him reflects an "inexorable conclusion that Schmink set up Balzarini to fail." (Mem. in Opp. at 11). He further states that when he attempted to speak with Lt. Schmink in person on May 3, 2017, Schmink "told him it was not necessary." (*Id.*; Def. Ex. 23). He reasons

that "Schmink had no interest in actually communicating effectively with [him], but only in making the appearance of doing so." (Mem. in Opp. at 11).[5]

Balzarini points to two other pieces of evidence in support of his contention that Lt. Schmink bore animus against National Guardsmen generally. First, he submitted an affidavit from a former Rockport Police Officer, Sean Andrus, stating that Lt. Schmink discouraged him from joining the Coast Guard Reserves in 2009. (Andrus Aff. ¶¶ 6, 8-9). Second, Balzarini was bypassed during his deployment to Afghanistan for a full-time appointment with the Police Department. The alleged bypass was the subject of separate litigation that resulted in a favorable settlement for Balzarini in 2013 and both events are substantially removed in time from the July 2017 disciplinary actions.[6]

As to Chief Horvath, the evidence is likewise thin. Balzarini contends that Chief Horvath's requests that he provide paystubs for his training, questioning whether he had suffered injuries while on active duty, and "talking down" to his National Guard commander, Sgt. Bonner, evince discriminatory animus.[7] Balzarini further contends that Chief Horvath "emphasized in budget presentations how those officers who miss work for National Guard

---

[5] The e-mail on which both parties rely clearly indicates that Balzarini had attempted to speak to Lt. Schmink at 3:57 p.m., only three minutes before Balzarini's patrol shift began and just as Schmink was heading to the gym. (Def. Ex. 23). A reasonable juror could certainly conclude that Lt. Schmink declined to speak at that particular moment because of the time restriction. (*Id.*).

[6] There is also evidence of positive treatment Lt. Schmink displayed toward Balzarini, notwithstanding his National Guard service. For example, Lt. Schmink recommended that Balzarini be appointed to CARRT in part because of his military service. (Schmink Dep. at 119-20). In addition, Lt. Schmink appointed Balzarini to the Honor Guard, recommended that he become a CARRT training instructor, and helped him secure a position as officer-in-charge of his shift. (Def. Exs. 8, 17, 18).

[7] Chief Horvath contends that he required the paystubs to calculate Balzarini's differential pay pursuant to Mulligan's pay-policy change. He also contends that he inquired whether Balzarini had suffered injuries while serving in Afghanistan after learning that he had hurt his back while helping move an obese man, and that he has a legitimate interest in ascertaining whether his officers are fit for duty.

service drain the [Police] Department's resources." (Mem. in Opp. at 13).[8]

In any event, the evidence, while susceptible of different interpretations, must be viewed in the light most favorable to Balzarini. Under the circumstances, there is sufficient evidence from which a reasonable jury could conclude that the disciplinary actions of July 2017 were motivated, at least in part, by his National Guard service, and therefore summary judgment will be denied.

## 2. Disciplinary Actions in September 2017

Balzarini further contends that defendants' decision to discipline him in September 2017 constituted retaliation for his filing the complaint in this action. However, the record fails to show any evidence that defendants' actions were motivated by Balzarini's National Guard service.

As noted, on August 28, 2017, Lt. Schmink learned that Balzarini had fired a civilian's firearm to prove his shooting ability while responding to a complaint of gunfire. (Def. Ex. 29). This story was verified by Officer Mahoney. (*Id.*). Balzarini's actions constituted a clear violation of department regulations. However, because Balzarini had filed this lawsuit, Chief Horvath believed that an internal investigation was inappropriate. Instead, the town hired an independent investigator, who concluded that Balzarini violated four departmental rules and regulations, and that his conduct constituted neglect of duty. (Def. Ex. 35). Pursuant to the investigator's report, Chief Horvath recommended that Balzarini be suspended for 10 days without pay. (Def. Ex. 36). The town's Board of Selectmen accepted that recommendation. (Vieira Dep. at 88-98).

---

[8] Acting Chief Mulligan was the one who instituted the pay change for Guardsmen to end what he deemed a "double-dipping" pay practice. (Def. Ex. 6). And Horvath contends that he requested information from Balzarini and two other officers serving in the National Guard to prepare for a town budget presentation, during which he advocated for more money and resources. (Horvath Dep. at 52-53).

Notably, Balzarini does not dispute any of those facts. Rather, he contends that discriminatory animus can be inferred because "Schmink reported the incident to Horvath only six weeks after both of them were named as defendants . . . in this action." (Mem. in Opp. at 14). However, it is undisputed that Lt. Schmink did not learn of Balzarini's misconduct until six weeks after this suit was filed. In addition, Balzarini contends that "the Department did not investigate the incident at all before it placed [him] on desk duty and took his service weapon." (*Id.*). But Chief Horvath retained an independent investigator—because Balzarini had filed suit against the department already, he believed that it would have been a conflict of interest to conduct an internal investigation.[9] The alternative—to conduct no investigation whatsoever— was inappropriate, given that a claim of serious misconduct had been raised.

Balzarini separately points to the fact that other Rockport officers have fired weapons owned by civilians without discipline. However, that was in a very different context. Those weapons were owned by a welder, Charlie Strople, who helped build the department's firing range and had explicit permission to use it. (Schmink Dep. at 208-10). Other officers used Strople's weapons 10 to 15 years ago, but only while wearing safety gear and while being supervised by training instructors. (*Id.*). By contrast, Balzarini fired the civilian's weapon away from police premises, without proper safety gear, and while unsupervised by training instructors. He also fired the weapon after being goaded by a civilian, not for self-defense or defense of others. The department's decision to treat that as a serious violation is well-supported by the undisputed evidence.

In short, Balzarini has not shown that the disciplinary actions of September 2017 were

---

[9] Balzarini separately contends that "no one knew that Anderson had *not* fired the gun." (Mem. in Opp. at 14) (emphasis in original). He raises that point to make a disparate-treatment argument. Crucially, however, neither he nor anyone else testified that Anderson fired the weapon. And, in any event, Anderson was disciplined in the form of a written reprimand. (Def. SMF ¶ 62).

motivated by his National Guard service. Because there is no separate claim based solely on that disciplinary action, the summary judgment ruling will not be affected. The Court will reserve for another day whether the evidence at the trial should be limited in any respect concerning the events of September 2017.

### 3.    Hostile Work Environment Claim

Finally, Balzarini contends that defendants' actions created a hostile work environment. The First Circuit has never held that a hostile work environment claim is cognizable under the USERRA. *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 31-32 & n.9 (1st Cir. 2010). In *Vega-Colon*, it assumed for purposes of the appeal that such a claim was available. *Id.* Balzarini notes that since Congress amended the USERRA in 2011, several other courts have concluded that the statute does permit such a claim. *See, e.g.*, *Tridico v. District of Columbia*, 130 F. Supp. 3d 17, 31 (D.D.C. 2015); *Montoya v. Orange County Sheriff's Dep't*, 987 F. Supp. 2d 981, 1012-15 (C.D. Cal. 2013). Like the court in *Vega-Colon*, the Court will assume for present purposes that such a claim is cognizable.

As a general matter, to prove a hostile work environment claim, a plaintiff must show that the "harassing behavior [was] sufficiently severe or pervasive to alter the conditions of his employment." *Vega-Colon*, 625 F.3d at 32. The harassment must be "both objectively and subjectively offensive." *Id.* "In making this determination," courts are to "examine all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citations and internal quotation marks omitted). Behavior that is not objectively "severe, physically threatening, or humiliating" is insufficient to establish a claim. *Id.*

Here, the alleged instances of harassment were not sufficiently severe, physically threatening, or humiliating to constitute the basis for an actionable claim. The complaint alleges that the following acts, taken together, constituted harassment:

- Chief Horvath's order that Balzarini provide paystubs and training schedules for his National Guard training, along with the name and contact information for his commanding officer (FAC ¶ 16);

- The conversation in July 2016, during which Chief Horvath asked whether Balzarini had suffered a limiting injury in Afghanistan (*Id.* ¶ 18);

- Chief Horvath's order that he provide a doctor's note to prove that he was sick on May 3, 2017 (*Id.* ¶ 19);

- Chief Horvath's June 2017 call to Sgt. Bonner to confirm whether Balzarini had attended his training (*Id.* ¶¶ 20, 22); and

- Chief Horvath's "mocking and rude" attitude as he informed Balzarini about the independent investigation into his 2016 shooting (*Id.* ¶ 31).

However, there were no instances of hostile comments, "name calling," or similar behavior. *See Vega-Colon*, 625 F.3d at 31. As to the claim concerning documentation of a medical condition, Balzarini himself could not recall whether Chief Horvath had directed him to provide a doctor's note in relation to the May 3, 2017 sick day. (Balzarini Dep. at 124). And even if Chief Horvath had been "mocking and rude" when informing Balzarini that he was being investigated for the 2016 shooting incident, a single instance of such behavior falls well short of the requirements of a hostile work environment claim. *Vega-Colon*, 625 F.3d at 32.

In his opposition, Balzarini points to two other instances of alleged harassment (neither of which is alleged in the complaint). First, he contends that Lt. Schmink reportedly told him "that

he should seek employment with another department and asked how long he was going to remain in the National Guard." (Mem. in Opp. at 17). However, he cannot recall under what circumstances or when those comments were made, and thus the alleged statements cannot be placed in any kind of context. Second, he contends that Chief Horvath discriminated against him by reopening an investigation into a citizen's complaint. (Mem. in Opp. at 17). But Chief Horvath reopened the investigation for the limited purpose of locating a witness; when the witness could not be located, he closed the investigation again, clearing Balzarini of wrongdoing. (Horvath Dep. at 218-19). Even assuming those facts to be true, the evidence falls well short of "severe, physically threatening, or humiliating" conduct.

In summary, there are insufficient facts from which a reasonable factfinder could conclude that Balzarini suffered an "abusive working environment" such that he is entitled to recover under the USERRA. Therefore, to the extent that the complaint alleges a claim based on a hostile work environment, defendants' motion for summary judgment will be granted.

## III.    **Motion to Amend**

Balzarini has also moved to amend his complaint to assert a claim under the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws ch. 151B, for discrimination based on military service. A party seeking to amend a complaint after the deadline set forth in a scheduling order must demonstrate "good cause" for the delay. *See O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004). The reason for the heightened standard under Rule 16 as compared with Rule 15 is to "preserve[ ] the integrity and effectiveness of Rule 16(b) scheduling orders." *Id.* at 155. In analyzing the plaintiff's reasons for delay, the Court must "focus[ ] on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).

Amendment may also be denied on the ground of futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The motion will be denied on the basis of undue delay.[10] Here, the original complaint was filed on July 17, 2017. The Court then issued a scheduling order establishing a deadline of March 2, 2018, for amendments to the pleadings. The motion to amend was filed on July 20, 2018, more than four months after the scheduling order deadline. Balzarini has not offered a rationale to justify the delay, other than to argue that both parties believed that USERRA provided recovery for emotional distress damages. However, there has been no material change in the facts, and defendants are not responsible for the mistakes of Balzarini's counsel. Accordingly, Balzarini has failed to establish the "good cause" required to file an untimely motion to amend.

## IV.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to the claim of a hostile work environment, and otherwise DENIED. Plaintiff's motion to amend is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: October 24, 2018

---

[10] There is also a serious question of futility. As defendants note, Mass. Gen. Laws ch. 151B, § 5 requires that a complaint be filed within 300 days of the discriminatory act. Therefore, the only basis for a Chapter 151B claim would be the disciplinary action in November 2017, arising out of the September 2017 shooting incident.